UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | 5:25-cv-02853-SSS-RAO | Date | November 3, 2025 |
|---|---|---|---|
| Title | *Adrian Salgado Valenzuela v. Fereti Semaia et al.* | | |

Present: The Honorable   SUNSHINE S. SYKES, UNITED STATES DISTRICT JUDGE

| Irene Vazquez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** **(IN CHAMBERS) ORDER GRANTING IN PART AND DENYING IN PART PETITIONER'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER [DKT. NO. 3]**

Before the Court is Petitioner's ex parte Application for a Temporary Restraining Order ("TRO") filed on October 28, 2025. [Dkt. No. 3, "Application" or "App."]. Respondents filed their Opposition to the TRO on October 30, 2025. [Dkt. No. 6, Opposition or "Opp."]. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Petitioner's TRO.

**I.   BACKGROUND**

Petitioner Adrian Salgado Valenzuela is a Mexican national that has resided in Southern California since he was four years old. [Dkt. No. 1 at 5, "Habeas Petition"; *see also* Dkt. No. 3-11 at 7]. On June 17, 2025, two ICE Officers seized Valenzuela and his friends in a parking lot outside a grocery store in Riverside, California. [Habeas Petition at 4]. Petitioner alleges that ICE agents had "no basis to suspect Petitioner of an immigration violation," but nonetheless took him into custody at Adelanto ICE Processing Center. [*Id.* at 4, 11]. Petitioner has been detained there since his arrest. [*Id.* at 11].

Weeks after his arrest, Petitioner appeared before an Immigration Judge ("IJ") for a hearing in July of 2025, at which the IJ granted a continuance so Petitioner could obtain legal counsel. [Habeas Petition at 5]. Petitioner and his family sought pro bono representation, only to later learn that they had unfortunately fallen victim to an elaborate scam that caused Petitioner to believe he had properly obtained counsel. This scam also caused Petitioner to attend a fraudulent bond hearing at which he was asked to pay a large amount of money. [*Id.* at 6–7].

It was not until August 6, 2025, when Petitioner and his family learned at his second hearing before the IJ that they had been scammed. [Habeas Petition at 7]. The IJ proceeded with the hearing despite Petitioner's request for another opportunity to obtain counsel. [*Id.* at 8]. As a result of the hearing, the IJ found Petitioner was inadmissible as charged, which insulated his detention from challenge. [*Id.* at 9]. Because Petitioner was not represented by counsel at this hearing, he alleges that this second hearing deprived him of his right to counsel and further erroneously shifted the burden of proof onto Petitioner to establish his noncitizenship.[1] [*Id.* at 8–9].

---

[1] This Order uses the term "noncitizenship" in place of "alienage" and "noncitizen" in place of "alien." The Court follows the U.S. Supreme Court and Ninth Circuit, where the use of the term "noncitizen" has become a common practice. *See Patel v. Garland*, 596 U.S. 328 (2022) (Barrett, J.); *United States v. Palomar-Santiago*, 593 U.S. 321 (2021) (Sotomayor, J.); *Barton v. Barr*, 590 U.S. 222, 226 n.2, (2020) (Kavanaugh, J.) ("This opinion uses the term 'noncitizen' as equivalent to the statutory term 'alien.'" (citing 8 U.S.C. § 1101(a)(3))); *Avilez v. Garland*, 69 F.4th 525 (9th Cir. 2023); *Arce v. United States*, 899 F.3d 796 (9th Cir. 2018). Additionally, this Court thinks it is prudent to "avoid language that reasonable readers might find offensive or distracting—unless the biased language is central to the meaning of the writing." *Chicago Manual of Style Online* 5.253, https://www.chicagomanualofstyle.org/book/ed17/part2/ch05/psec253.html. As noted by the Ninth Circuit, "[t]he word alien can suggest 'strange,' 'different,'
   (continued . . . )

Petitioner obtained pro bono representation on September 7, 2025. Days after, Petitioner moved to withdraw the pleadings as to his noncitizenship. [Habeas Petition at 10]. The IJ denied his motion, which Petitioner alleges was in violation of his due process rights. [*Id.*].

On October 28, 2025, Petitioner filed this petition seeking a writ of habeas corpus. [*See generally* Habeas Petition]. Petitioner alleges his detention violates the Fourth and Fifth Amendments of the United States Constitution, the Immigration and Nationality Act ("INA") and the Administrative Procedure Act ("APA"). [*Id.* at 32–35]. He requests the following relief: that the Court order his immediate release or either (1) require the Government provide Petitioner with a hearing before a neutral arbiter at which the Government must prove by clear and convincing evidence that Petitioner does not pose a danger or flight risk, or (2) order the Government provide Petitioner with a bond hearing pursuant to 8 U.S.C. § 1226(a). [*Id.* at 35].

On the same day of filing his Habeas Petition, Petitioner also filed an Application for a TRO. [*See generally* Application]. Petitioner's Application for a TRO requests the same underlying relief in the habeas petition. [*Id.*].

Respondents oppose the TRO, arguing that Petitioner seeks an improper remedy for the allegedly wrongful arrest, that the Court lacks subject matter jurisdiction, or that Petitioner relies on an incorrect interpretation of the INA. [*See generally* Opposition].

For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Petitioner's TRO.

II.     **LEGAL STANDARD**

To justify ex parte relief, the moving party must make two showings: (1) "the evidence must show that the moving party's cause will be irreparably

---

'repugnant,' 'hostile,' and 'opposed[.]'" *Avilez*, 69 F.4th at 527 n.1 (citing *Alien*, *Webster's Third New International Dictionary* 53 (2002)). Accordingly, because the word "noncitizen" is synonymous and does not encompass such negative connotations, the Court finds "noncitizen" is a better word choice. *See Alien* and *Noncitizen*, *American Heritage Dictionary of English Language* 44, 1198 (5th ed. 2011).

prejudiced if the underlying motion is heard according to regular noticed motion procedures"; and (2) "it must be established that the moving party is without fault in creating the crisis that requires ex parte relief, or that the crisis occurred as a result of excusable neglect." *Mission Power Eng'g Co. v. Cont'l Cas. Co.*, 883 F. Supp. 488, 492 (C.D. Cal. 1995).[2]

For the Court to grant an application for a TRO, the moving party must show: (1) that he is "likely to succeed on the merits" of his underlying claim, (2) that he is "likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities tips in his favor," and (4) that the requested injunction "is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *See Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.,* 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).

The Ninth Circuit uses a sliding scale approach to preliminary injunctions, such that "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Under the sliding scale approach, a petitioner is entitled to a TRO if he has raised "serious questions going to the merits ... and the balance of hardships tips sharply in [his] favor." *All. for the Wild Rockies*, 632 F.3d at 1131 (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)).

## III. DISCUSSION

Petitioner requests the TRO because he believes his arrest was unlawful, and his continued detention constitutes an ongoing deprivation of his constitutional rights. [App. at 5, 10]. In requesting a TRO, Petitioner argues that his detention is

---

[2] Ordinarily, the "circumstances justifying the issuance of an ex parte [temporary restraining] order are extremely limited." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). To be entitled to an ex parte temporary restraining order, Plaintiffs must set out "specific facts in an affidavit or a verified complaint clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. Pro. 65(b)(1)(A). However, because Petitioner has provided Respondents with notice of this ex parte filing, and Respondents have filed an Opposition, the Court will proceed.

an unreasonable seizure under the Fourth Amendment, that he was deprived of liberty without due process of law in violation of the Fifth Amendment Due Process Clause, and that his arrest and detention violate the INA due to Respondents' reliance on erroneous statutory interpretation.  [*See id.* at 10].

Respondents' Opposition argues first that this Court lacks jurisdiction over this matter.  [Opp. at 13–18].  In the alternative, Respondents argue Petitioner fails to meet the requirements for a TRO.  [*Id.* at 11–19].

### A.     Jurisdiction

Article III "generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case," so this Court first considers Respondents' challenge to this Court's jurisdiction under 8 U.S.C. § 1252.  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  In its Opposition, Respondents contend that § 1252(g) and § 1252(b)(9) preclude review of Petitioner's claims.  [Opp. at 14].  The Court examines each subsection in turn.

#### 1.     Section 1252(g)

Respondents first identify § 1252(g) as a bar to review by this Court.  [Opp. at 13–15].  Section 1252(g), unless other laws provide jurisdiction, strips all courts of jurisdiction to hear "any cause or claim by or on behalf of any [noncitizen] arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any [noncitizen] under this chapter."  § 1252(g).

Respondents believe Petitioner's claims "stem from his removal proceedings," which "arose from the decision to commence such proceedings against him."  [Opp. at 14].  If Respondents' argument is true, then this Court would lack jurisdiction over this TRO.

The Supreme Court previously characterized § 1252(g) as a narrow provision, applying "only to three discrete actions that the Attorney General may take: her 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'"  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482 (1999) (emphasis in original).  In doing so, the Supreme Court found it "implausible that the mention of *three discrete events* along the road to deportation was a shorthand way to referring to *all claims arising from* deportation proceedings."  *Id.* (emphasis added).

Following the Supreme Court's guidance in *Reno*, this Court does not find that Petitioner's claim regarding the constitutionality of his arrest or whether he is subject to mandatory detention during the pendency of his removal proceedings falls under § 1252(g)'s prohibition on judicial review.

### 2.    Section 1252(b)(9)

Moreover, Respondents cite to § 1252(b)(9) as channeling "judicial review of all [claims arising from deportation proceedings]" to the appropriate federal court of appeals.  [Opp. at 15 (citing Section 1252(b)(9))].  Although § 1252(b)(9) allocates judicial review to courts of appeals, this subsection has a much narrower reach than Respondents suggest.

Respondents' argument cites Supreme Court precedent that refers to § 1252(b)(9) as the "unmistakable 'zipper' clause" that "'channels judicial review of all [claims arising from deportation proceedings].'"  [Opp. at 16, (citing *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999)).]  Though it may appear self-evident, it is important to note that § 1252(b)(9) exists under § 1252(b).  Section 1252(b) lists "[r]equirements for review of orders of removal." § 1252(b). But 1252(b)(9) channels review of "final orders of removal" to federal courts of appeals.

Nothing in the record indicates that any order of removal has been issued for Petitioner.  Rather, Petitioner has merely been detained without a bond hearing.  Without an order of removal, § 1252(b)(9) alone does not bar this Court from reviewing Petitioner's TRO regarding the legality of his arrest or his right to receive a bond hearing pursuant to the INA.

Having established this Court's jurisdiction to review Petitioner's TRO, the Court now evaluates whether the TRO is appropriate.  Given the distinct nature of the two issues raised by Petitioner's TRO, the Court treats the Fourth and Fifth Amendment issues separately from Petitioner's argument regarding the INA.

### B.    Fourth and Fifth Amendment Violations

Petitioner's Application for a TRO requests Petitioner's immediate release given his unlawful arrest by Respondents without reasonable suspicion or due process. [App. at 11].  Petitioner asserts only one of the four enumerated criteria from *Vasquez Perdomo v. Noem* applies to him. *Vasquez Perdomo v. Noem*, 148 F.4th 656, 672 (9th Cir. 2025) (prohibiting government officials from relying solely on "[a]pparent race or ethnicity"; "[s]peaking Spanish or speaking English

with an accent"; [p]resence at a particular location"; or "[t]he type of work one does" to form reasonable suspicion for a detentive stop).  Because the only applicable criteria is his apparent race or ethnicity, Petitioner maintains that no reasonable suspicion exists where race cannot be the "single factor" to arrest him. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975).

Respondents argue that this Court should deny the TRO because Petitioner cannot meet the elements required for a TRO.  The Opposition correctly observes that Petitioner cannot obtain habeas relief where administrative removal proceedings have already commenced.  [Opp. at 19–20].  *See also Lopez-Mendoza*, 468 U.S. at 1040 (finding that the "mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding"); *Nora Noemi Marroquin-Salazar v. Kristi Noem, et al.*, 5:25-cv-02367-FLA-JC (C.D. Cal. 2025) (denying the petitioner's claim of unlawful detention based in similar grounds).

Indeed, this Court cannot provide the remedy Petitioner requests: release from detention.  As Respondents correctly note, the remedy for an unlawful arrest is the suppression of evidence obtained therefrom, not release from custody.  *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984).  The Supreme Court has articulated that "the 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest . . . interrogation occurred." *Id.*

Accordingly, Petitioner has not presented grounds for relief that he can show a likelihood of success on the merits or demonstrate a serious question going to the merits.  Absent that showing, Petitioner fails to show he is entitled to a TRO on these grounds.  The Court now considers whether Petitioner is entitled to a bond hearing.

### C. Right to Bond Hearing Under the INA

In the alternative, Petitioner requests the Court immediately release him from detention or order an individualized bond hearing. [App. at 16–17]. According to Petitioner, continued detention constitutes irreparable injury when he is statutorily entitled to a bond hearing. [*Id.* at 16–17, 23]. Denying Petitioner of a bond hearing prolongs his detention in violation of § 1226 and subjects him to the irreparable harms associated with immigration detention as recognized by the Ninth Circuit. [App. at 24, (citing *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (including subpar medical and psychiatric care and economic burdens are among the irreparable harms imposed on individuals subject to immigration

detention))]. As the TRO requests either release from custody or an individualized bond hearing, Petitioner insists granting the TRO is necessary to prevent continued detention without due process. [App. at 24].

Respondents argue that this Court should deny the TRO for two primary reasons: (1) Petitioner cannot meet the necessary elements for a TRO, and (2) Petitioner has not exhausted administrative remedies before the BIA. [Opp. at 22–28]. The Court will evaluate whether Petitioner has demonstrated the elements required to seek a TRO, and then will address the question of exhaustion of remedies.

### 1. Serious Question Raised

Here, and as previously discussed by this Court and many others, Petitioner's TRO raises serious questions about the legality of his prolonged detention without a bond hearing.[3] [App. at 16–24].

Individuals detained under § 1226(a) are entitled to receive bond hearings at the outset of detention. 8 C.F.R. §§ 236.1(d)(1); *see also Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018). As articulated by the Ninth Circuit, "§ 1226(a) stands out from the other immigration detention provisions in key respects." *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1202 (9th Cir. 2022) (observing that § 1226(a) and its implementing regulations "provide extensive procedural protections that are unavailable under other detention provision"). Not only does § 1226(a) provide several layers of review of the agency's initial custody determination, but it also confers "an initial bond hearing before a neutral decisionmaker, the opportunity to be represented by counsel and to present evidence, the right to appeal, and the right to seek a new hearing when circumstances materially change." *Id.*

---

[3] *See Bautista v. Santacruz, Jr.*, Case No. 5:25-cv-01873-SSS-BFM, Dkt. No. 14 (C.D. Cal. July 28, 2025) (granting petitioners' TRO on the same legal issue). *See also Diaz Martinez v. HYDE, et al.*, No. CV 25-11613-BEM, 2025 WL 2084238 at *2–3 (D. Mass. July 24, 2025) (distinguishing § 1226, "a separate (non-mandatory) detention scheme applicable when an individual is 'already in the country'" from § 1225, which subjects "applicants for admission" to mandatory detention); *Rodriguez Vazquez v. Bostock, et al.*, 3:25-CV-05240-TMC, 2025 WL 2782499 (W.D. Wash. Sept. 30, 2025) (granting summary judgment on the same issue).

The Department of Homeland Security revisited its position on detention and release authorities, choosing unilaterally in July of 2025 to treat individuals arrested and detained under Section 236 of the INA as "applicants for admission" under Section 235. [App. at 18–19]. While Respondents engage in extensive statutory interpretation in their Opposition to argue Petitioner is subject to Section 235, and thus ineligible for a bond hearing, this is contrary to orders issued in district courts across the United States. [*See* App. at 19–20 n.9 (collecting authorities)].

Consistent with this Court's order in *Bautista*, the Court maintains that detention under § 1225 applies to "applicants for admission," which fall into two categories as articulated in *Jennings*. *See Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). Section 1225 subjects "[a]ny [noncitizen] subject to the procedure under [§ 1225]" to mandatory detention. § 1225(b)(1)(B)(iii)(IV). In contrast, as discussed above, § 1226(a) confers procedural protections to individuals apprehended and detained under that section of the INA. The juxtaposition of the procedural protections between these subsections suggests Congress intended that they apply to a different set of individuals.

Petitioner is not an applicant for admission, and benefits from the procedural protections of § 1226(a). Therefore, the Court holds that Petitioner's TRO raises a serious question as to the legitimacy of DHS's interpretation of the INA that has resulted in withholding protections that Petitioner would have otherwise been afforded under § 1226(a).

### 2. Likelihood of Irreparable Harm

Respondents suggest that continued detention is insufficient where administrative remedies have not been exhausted. [Opp. at 22].[4] Beyond this, Respondents do not appear to contest the nature of irreparable harm described in Petitioner's Application.

Petitioner cites to the irreparable harms described by the Ninth Circuit in *Hernandez v. Sessions* that are "imposed on anyone subject to immigration detention." [App. at 24]. 827 F.2d at 995. Moreover, Petitioner alleges

---

[4] The Court addresses issues of the adequacy of remedy in Part D in connection with exhaustion of remedies. For purposes of irreparable harm discussed *infra*, the Court finds Respondents' argument unavailing.

irreparable harm to his legal rights, both in being denied a bond hearing and his inability to access proper resources to prepare for his asylum case due to his continued detention. [*Id.* at 24–25].

The Court finds that Petitioner's continued detention without an initial bond hearing constitutes immediate and irreparable injury, as this violates statutory rights afforded under § 1226(a). *See Rodriguez Diaz*, 53 F.4th at 1202.

### 3. Balance of Hardships and Public Interest

The balance of the hardships tips strongly in Petitioner's favor as he will suffer great hardship if this Court were to deny the TRO. *See Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (requiring the balance of hardships to "tip sharply" in the moving party's favor).

Respondents believe the BIA is better postured than this Court to resolve disputes like this and "provide clear and uniform guidance." [Opp. at 13]. Respondents argue that the Government has a compelling interest in "the steady enforcement of its immigration laws," and that granting the TRO would be "especially inappropriate" by it "disrupts the status quo." [*Id.* at 27]. Given the uniform nature of district court decisions involving the legality of the DHS's new interpretation of the INA, the Court has doubts on whether granting the TRO would disrupt the status quo, especially when the change in policy stands to jeopardize Petitioner's rights.

Petitioner finally argues that the TRO would serve the public interest as his claims would uphold procedural protections against unlawful detention. [App. at 25]. Where Petitioner's argument is premised on the unlawful nature of Respondents' conduct, the Court agrees that it serves neither equity nor the public interest to allow continued violations of federal law. *See Galvez v. Jaddou*, 52 F.4th 821, 832 (9th Cir. 2022).

Thus, the Court finds the public interest weighs in favor of Petitioner. His continued detention without the legal protections afforded under § 1226(a) violates Petitioner's due process rights. [*See generally* App.; Dkt. 1]. *See Xuyue Zhang v. Barr*, 612 F.Supp.3d 1005, 1017 (C.D. Cal.) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution."). As such, the Court finds that both factors weigh heavily in favor of Petitioner.

The Court now considers the parties' arguments regarding exhaustion.

### D. Exhaustion of Remedies

"[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *McKart v. United States,* 395 U.S. 185, 193 (1969). If an individual has not exhausted available administrative remedies, district courts generally should either dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted remedies. *See Morrison–Knudsen Co. v. CHG Int'l, Inc.,* 811 F.2d 1209, 1223 (9th Cir. 1987).

Nevertheless, courts have found circumstances to excuse exhaustion of remedies. *See Laing v. Ashcroft*, 370 F.3d 994, 998 (9th Cir. 2004) ("If exhaustion is required by statute, it may be mandatory and jurisdictional, but courts have discretion to waive a prudential requirement."). No provision of the immigration laws appears to clearly require exhaustion of administrative remedies such that failure to exhaust would pose a jurisdictional bar to review. *Miranda v. Garland*, 34 F.4th 338, 352 (4th Cir. 2022). The Court, therefore, examines whether it should excuse Petitioner's failure to exhaust administrative remedies, or require exhaustion as a prudential matter. *See Laing*, 370 F.3d at 998.

#### 1. Limits to Discretion

Despite having the discretion to waive prudential limits, a court's discretion "is not unfettered." *Id.* A court may require prudential exhaustion if: "(1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision; (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review." *Puga v. Chertoff,* 488 F.3d 812, 815 (9th Cir. 2007).

Respondents argue each of these considerations are at play. [Opp. at 22–23]. The Opposition argues that Petitioner must exhaust his remedies at the BIA, outlining the need for agency expertise, concerns regarding bypassing the administrative scheme, and the prospect of the administrative process to self-correct. [*Id.* at 22]. The Court is skeptical of each of these considerations.

*First*, the role of agency expertise is unclear. The parties agree that the crux of this dispute is whether § 1225 or §1226 governs Petitioner's detention. Such question is a matter of statutory interpretation, one to which the parties dedicate a considerable portion of their pleadings. [App. at 6–15; Opp. at 19–23]. In their argument supporting the application of § 1225 over § 1226, Respondents argue that

"longstanding agency practice carries little, if any, weight under *Loper Bright*." [Opp. at 26–27].  But later Respondents suggest this Court would benefit from the BIA's expertise in immigration bond decisions.  [Opp. at 24].  Not only is the agency expertise of dubious value in interpreting these specific statutes, but such statutory interpretation is also unlikely to require agency consideration to generate a proper record to reach a proper decision.

*Second*, Respondents argue that excusing exhaustion here and bypassing BIA review is "improper." [Opp. at 22].  Yet Respondents provide little support for this proposition beyond this conclusory characterization.  The Court further finds that administrative exhaustion might be futile, as the BIA would most likely apply precedential decisions to essentially affirm Petitioner's current situation.  *See Matter of Jonathan Javier Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025) (upholding Respondents' interpretation of the INA to deny bond hearings).  Where administrative channels of remedy are futile, the Court finds no need for administrative exhaustion.

*Third*, Respondents urges this Court to "allow the agency process to correct its own mistakes." [Opp. at 22].  The Court is unconvinced that the BIA would self-correct in light of the BIA's recent decision in *Matter of Jonathan Javier Yajure Hurtado*.  This case has effectively accepted Respondents' position, despite the contrary interpretation reached by various district courts.  Given the likely futile nature of administrative remedies, the Court does not find any grounds to require prudential exhaustion.

### 2. Waiver of Exhaustion

Courts may waive prudential exhaustion if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing*, 370 F.3d at 1000.  The precedential BIA decision cited by Respondents coupled with district courts' finding this opinion unpersuasive sufficiently demonstrates that appellate review at the BIA would be inadequate or futile.[5]  [Opp. at 24].

---

[5] It also appears Respondents somewhat concede that Petitioner is entitled to a TRO.  [*See* Opp. at 28 (requesting that this Court limit relief to "[r]equiring release unless a Section 1226(a) bond hearing is provided within seven (7) days)].

Having found exhaustion of remedies is not required and for the other reasons discussed above, the Court hereby **GRANTS** Petitioners' TRO.

## IV. CONCLUSION

As Petitioner's Application pertains to the Fourth Amendment violation, the Court **DENIES IN PART** the requested relief in the TRO.  However, regarding Petitioner's right to a bond hearing under § 1226, the Court finds Petitioner's TRO raises serious questions concerning the merits of the case, the balance of the hardships tips sharply in Petitioners' favor, he is likely to suffer irreparable harm in the form of continued detention without an initial bond hearing, and granting his requested relief is in the public interest.  Accordingly, the Court finds that the TRO is necessary to prevent the immediate and irreparable injury that may occur.  As such, the TRO is **GRANTED IN PART**.  [Dkt. No. 3].

In accordance with the above, pursuant to Federal Rule of Civil Procedure 65, it is **ORDERED THAT**:

- Respondents are enjoined from continuing to detain Petitioner unless he is provided an individualized bond hearing before an immigration judge pursuant to 8 U.S.C. § 1226(a) within 7 days of the date of this Order;

- Consistent with the Court's previous order from October 28, 2025, Respondents are enjoined from transferring, relocating, or removing Petitioner from the Central District of California without further order of the Court and pending final resolution of this litigation.  [*See* Dkt. No. 5].

This Order shall be in effect **until November 14, 2025**.  The Court **ORDERS** Respondents **TO SHOW CAUSE** as to why a preliminary injunction should not issue.  Respondents shall file any response by **Friday November 7, 2025**, and Petitioner shall file any reply by noon on **Wednesday November 12, 2025**.  The Court **SETS** a hearing in person on whether a preliminary injunction should issue on **November 14, 2025, at 1:00 p.m.,** in Courtroom 2, on the 2nd Floor of the George E. Brown, Jr. Federal Building and United States Courthouse at 3470 Twelfth Street, Riverside, California 92501.

**IT IS SO ORDERED**.